# CASES

# THE PREROGATIVE COURT

## OF THE STATE OF NEW-JERSEY,

### APRIL TERM, 1843.

---

In the matter of ABRAHAM COURSEN'S WILL.[*]

By the commission and explanatory instructions to lord Cornbury, all the ec-
clesiastical jurisdiction of the province of New-Jersey relating to " the col-
lating to benefices, granting licenses for marriages, and probate of wills,"
was reserved to the governor. He was not only ordinary, but metropolitan
of the province. He had no superior but the queen in council, and no sub-
ordinates. His jurisdiction over these subjects was sole and exclusive.

This constitution of the court continued till the revolution, and was adopted
by the convention which framed the constitution of the state in seventeen
hundred and seventy-six.

For one hundred and forty years, the governor or ordinary has been the only
judge of probate known to the constitution of New-Jersey.

The surrogates appointed by the governor were mere deputies, subject to the
control and supervision of the ordinary, and to be removed at his pleasure.

By the appointment of surrogates, the ordinary did not in the least curtail his
own jurisdiction. Whilst he held appellate jurisdiction over their acts, his
own original jurisdiction remained entire.

The surrogates did not hold to the ordinary the relation which the English
ordinaries hold to their metropolitan. The ordinary retained jurisdiction
of all cases. The surrogate, acting as his deputy, had also jurisdiction of

[*] The reporter is indebted to J. P. Bradley, esquire, for the report of this
important decision.

[In the matter of Abraham Coursen's Will.]

all cases submitted to him, unless some special restriction were inserted in his commission.

The doctrine of *bona notabilia* had never any place in this state.

The surrogate and the orphans' court, in matters of probate and administration, were left, by the act of seventeen hundred and eighty-four, which established the orphans' court, to occupy the same relation to the ordinary, which previous to that statute the surrogate alone had occupied.

The act of eighteen hundred and twenty is similar in this respect to the act of seventeen hundred and eighty-four.

The fact that the appointment of his surrogates has been taken from the ordinary and conferred upon the joint-meeting, does not in the least alter their relative jurisdictions or powers.

The surrogates are still, in the language of the act of eighteen hundred and twenty, the ordinary's surrogates, and in effect his deputies.

The ordinary has the same original and appellate powers now that he ever had.

The original jurisdiction of the ordinary over the probate of wills and the granting of letters of administration, is general and full, and not limited and special.

The acts of seventeen hundred and eighty-four and eighteen hundred and twenty, are merely declaratory, so far as they attempt to specify the subjects of the jurisdiction of the ordinary or of his surrogates.

The ordinary has, by virtue of his general powers, undoubted jurisdiction in the matter of the probate of a will, where the testator, at the time of his death, resided in a foreign state, and where the will has been proved there.

The jurisdiction of the ordinary in such cases is complete, without the aid of any statute, at least where the original will is produced.

Whether he may, under such circumstances, grant letters testamentary upon the production of an exemplified copy of the will, is perhaps doubtful.

Whether, since the acts of seventeen hundred and eighty-four and eighteen hundred and twenty have limited the surrogate's jurisdiction to his own county, he may grant probate of a foreign will independent of the statute, seems doubtful.

The jurisdiction of the ordinary is not taken away or impaired by the act of eighteen hundred and twenty-eight, which authorizes surrogates to grant letters testamentary upon an exemplified copy of a foreign will proved in another state. The ordinary may proceed independent of the statute, nor is he bound by the terms or the equity of that statute to exact security of foreign executors.

If one executor of a foreign will proved in another state, has applied for pro-

[In the matter of Abraham Coursen's Will.]

bate under the statute, another executor may produce and prove the original will independent of the statute.

Nor is it necessary that the executor who produces the original will should prove it before the same surrogate who granted letters testamentary to his co-executor.

He may prove it before the ordinary, or perhaps before another surrogate. The applications are distinct and independent.

When, however, the executors have all taken out letters, they are co-executors of the will, and must sue and be sued jointly, in the same manner as if they had all proved the will at the same time and before the same officer.

The jurisdiction of the ordinary is concurrent with that of his surrogates, and whenever a surrogate has obtained cognizance of a particular case, the ordinary cannot interfere *pendente lite.*

He may review the surrogate's proceeding by appeal, but in no other way.

A certified copy of the surrogate's proceedings on an application for probate, has the effect of a record, against which no averment will be admitted by the ordinary.

If it appear by the certified copy of the surrogate's proceedings that probate was granted by him on the application of both of the executors, one of the executors will not be permitted to prove, by way of destroying the effect of that record as evidence against him before the ordinary, that his name was used in the application to the surrogate without his consent.

A caveat is incident to all ecclesiastical courts, and prevents the case from being proceeded in without the caveator being heard.

It is a general rule, that all persons who may be injured by admitting a will or codicil to probate, may caveat against it.

GERSHOM H. Coursen, of New-York, one of the executors of the last will and testament of Abraham Coursen, deceased, took an order at the term of April, eighteen hundred and forty-three, to show cause on the first of May, why the original will and codicil should not be admitted to probate. The testator resided and died in the city of New-York. By his will, Ephraim Marsh and another were appointed executors; by the codicil, G. H. Coursen was substituted as co-executor with Marsh. Coursen proved the will and codicil in New-York.

Afterwards, on the twenty-ninth of March last, application on behalf of both executors, was made to the surrogate of Morris,

for probate in this state by exemplified copy, under the act of March sixth, eighteen hundred and twenty-eight. The usual order being granted and published, the surrogate, on the first day of May, granted letters testamentary to Marsh. A certified copy of his proceedings was produced on this hearing. Coursen denied that he had authorized his name to be used in that application. By proceeding under the statute, he would be obliged to give security, being a non-resident executor. Marsh opposed Coursen's present application before the ordinary. The cause came on for hearing upon the rule to show cause before the ordinary, at Newark, on the first day of May.

*A. Whitehead* and *O. S. Halsted*, for Marsh, contended, first, that the ordinary had no jurisdiction of the case. His jurisdiction since the act of eighteen hundred and twenty, is special and limited, reaching only to cases where a "convenience" would be subserved by his exercising it: *Elm. Dig.* 362, 363, *secs.* 21, 27. And cases like the present are specially provided for by the act of eighteen hundred and twenty-eight, which expressly gives the surrogates jurisdiction of the probate of foreign wills, proved in another state. That act must be construed as exclusive and compulsory : *Elm. Dig.* 601.

Secondly. But admitting that the ordinary has jurisdiction, his jurisdiction is only concurrent with that of the surrogates; and the surrogate of Morris having first taken cognizance of the case, his cognizance is now exclusive.

*F. T. Frelinghuysen* and *A. C. M. Pennington*, contra, contended, first, that the ordinary has complete jurisdiction, *ex officio*; that originally the surrogates were only his deputies, and the same relation still subsists between them : *Elm. Dig.* 444 ; 4 *Griffith L. Reg.* 1185 ; *Toller's Ex.* 50.

That the surrogate's, and not the ordinary's jurisdiction, is special and limited : 4 *Griffith*, 1238, *n*; *Elm. Dig.* 444, *pl.* 4.

That the act of eighteen hundred and twenty-eight is

merely affirmative, giving surrogates a new power, and providing a remedy where the original will cannot be produced.

Secondly. Admitting the surrogate's certificate to be true, he had no jurisdiction, and his proceedings are void. It was not a copy of the will, but of the record of the will, which was produced before him; and letters were granted to one only of the executors, whereas the statute requires all to concur.

Thirdly. They offered to impeach the certificate of the surrogate, as obtained on a fraudulent suggestion of facts, by proof that Coursen never authorized the application to be made, and that he protested to the surrogate against proceeding. The ordinary declined to receive the proofs offered.

The Ordinary. I have no difficulty in deciding this case at once; but as the parties may be saved future expense by a decision of the several points which have been raised before me on the argument, I will take them up in order.

Nothing is more embarrassing in our whole municipal system than this subject of the powers of the ordinary, the surrogates, and the orphans' court. The course and practice of ecclesiastical courts in general, are so little familiar to our bar, and our statute laws are often so vague and uncertain, that the whole subject presents a wilderness of perplexity to the practitioner. A reference to the history of the courts exercising ecclesiastical jurisdiction in New-Jersey, may serve to throw some light on this subject.

After the surrender of the powers of government by the proprietors of the province to queen Anne, in seventeen hundred and two, the specific form of its constitution depended, until the adoption of our present constitution in seventeen hundred and seventy-six, upon the commissions and instructions given to the several governors who were appointed by the crown. These instructions were little varied during the whole period. In reference to the constitution of the office and duties of the ordinary, they were never varied at all.

By the commission and explanatory instructions given to

lord Cornbury, the first royal governor, all the ecclesiastical jurisdiction of the province relating to "the collating to benefices, granting licenses for marriages and probate of wills," was reserved to the governor : *Leaming and Spicer*, 639. He was not only ordinary, but metropolitan of the province. He had no superior but the queen in council. His court was called the "prerogative court," an appellation applied in England to the archbishop's court. Nor had he any subordinates; his jurisdiction over these subjects was sole and exclusive. This constitution of the court continued till the revolution, and was adopted by the convention which framed the present constitution of the state in seventeen hundred and seventy-six. For one hundred and forty years the governor or ordinary has been the only judge of probate known to the constitution of New-Jersey.

But at an early day the provincial governors, for their own and the people's convenience, appointed deputies, with the name of surrogates, residing in different parts of the province, to act in their stead, upon such cases as the people chose to submit to them. Sometimes there were more of these deputies, sometimes less; sometimes more than one in a county, sometimes only one for two or three counties. They were mere deputies, subject to the control and supervision of the ordinary, and to be removed at his pleasure. By appointing them the ordinary did not in the least curtail his own jurisdiction. Whilst he held appellate jurisdiction of their acts, his own original jurisdiction remained entire.

These surrogates did not hold to the ordinary the relation which the English ordinaries hold to their metropolitan. The English ordinary has exclusive jurisdiction where the goods of the deceased are all situated in his diocese; and the metropolitan has exclusive jurisdiction where notable goods are situated in two or more dioceses. No relation of this kind subsisted between the ordinary and surrogates of New-Jersey. The ordinary retained jurisdiction of all cases. The surrogate, acting as his deputy, had also jurisdiction of all cases submitted to

35*

him, unless some special restriction were inserted in his commission. New-Jersey was never subdivided into dioceses. The doctrine of *bona notabilia* had never any place here.

The power of the ordinary to appoint these officers, seems never to have been questioned. Their acts were recognized as valid by the courts, and they came to be considered as lawful and competent judges of the matters submitted to their cognizance. And although they are unknown to the constitution, they have been frequently recognized by acts of the legislature. But no legislature has ever attempted materially to alter the relation between the ordinary and his surrogates.

The first act which appears on our statute book, in relation to the courts of probate, is that of December, seventeen hundred and eighty-four, by which it was directed, "that the ordinary should thereafter appoint but one deputy or surrogate in each county, and that the power and authority of the surrogate should be limited to the county for which he should be appointed." This act also established a new county court, called the orphans' court, composed of at least three judges of the common pleas, which, besides considerable equitable jurisdiction, was invested with certain of the powers previously exercised by the surrogate, such as hearing and deciding disputes about the validity of wills and rights of administration: which, when they arose before the surrogate, he was directed to hand over to that court. Thus the orphans' court shared a portion of the surrogate's previous jurisdiction, and so far stood in his shoes, an appeal lying to the ordinary from its decisions in the same manner as from those of the surrogate's. Both the surrogate and the orphans' court, in matters of probate and administration, were left to occupy the same relation to the ordinary, which, previous to the statute, the surrogate alone had occupied. The present law, which was passed in eighteen hundred and twenty, is similar in this respect to that of seventeen hundred and eighty-four,

The fact, that in eighteen hundred and twenty-two, the appointment of his surrogates was taken from the ordinary and

[In the matter of Abraham Coursen's Will.]

conferred upon the joint meeting, (*Harr. Com.* 32,) does not, in the least, alter their relative jurisdictions or powers. The surrogates are still, in the language of the act of eighteen hundred and twenty, the ordinary's surrogates, and, in effect, his "deputies."

From this short sketch of the history of these jurisdictions, it sufficiently appears that the ordinary has the same original and appellate powers, now, that he ever had. He has never been deprived of these powers by any act of the legislature, in fact; leaving out of view the question, whether an act of that kind would be constitutional if passed at all. The acts of seventeen hundred and eighty-four and eighteen hundred and twenty, are merely declaratory, so far as they attempt to specify the subjects of the ordinary's jurisdiction, or that of his surrogates. I have, therefore, no doubt at all that the ordinary's original jurisdiction over the probate of wills, and the granting of letters of administration, is general and full, and not limited and special.

Neither have I the least doubt as to the ordinary's jurisdiction over a case like the present, where the testator resided, at the time of his death, in a foreign state, and where the will has already been proved there. The ordinary has cognizance of this class of cases, by virtue of his general powers. It is a power which is frequently exercised by the ecclesiastical courts of England: 1 *Williams's Exec.* 172, 204; 1 *Hagg. Rep.* 625. And the jurisdiction of the ordinary is complete without the aid of statute on the subject—at least where the original will is produced. Whether he may grant letters testamentary upon an exemplified copy, is, perhaps, doubtful. It is the opinion of intelligent counsel that under the act of seventeen hundred and thirteen and fourteen, he may. *Elm. Dig.* 595, *pl.* 3; 4 *Griffith, L. R.* 1241, *n.*

Whether, since the acts of seventeen hundred and eighty-four and eighteen hundred and twenty have limited the surrogate's jurisdiction to his own county, he may grant probate of a foreign will without recourse to the statutes, has been questioned by

[In the matter of Abraham Coursen's Will.]

some. The precise meaning of that limitation has not been defined. But I believe it is generally conceded by the bar that the surrogate's jurisdiction does extend to such a case. I have known instances of its being exercised under the advice of careful and eminent counsel. The limitation of the surrogate's power by county lines, may have relation simply to the territory within which he may perform any act as surrogate. The surrogate of Morris or Cape May, for example, may not go into the county of Middlesex and transact the local business of that county, which would naturally come before the surrogate of Middlesex. Or it may go further, and debar the surrogate of one county cognizance of probate or administration where the deceased resided, at the time of his death; in another county, the surrogate of which may be deemed to have a preferable right to take jurisdiction of the case. This is the construction given by Mr. Griffith, 4 *Law Reg.* 1238, *n.* But neither of these constructions of the limitation created by the statute, would prevent any surrogate from proving the will of a non-resident of the state, where one surrogate cannot set up any better claim to cognizance of the case than another: 4 *Griffith's L. Reg.* 1241, *n.* But however this may be, there is no question but that the ordinary has complete jurisdiction.

This jurisdiction of the ordinary is not taken away or impaired by the act of eighteen hundred and twenty-eight, which authorizes any surrogate to grant letters testamentary upon an exemplified copy of a foreign will proved in another state. That act is merely affirmative. It does not, in the least, interfere with the general *ex officio* powers of the ordinary, or the manner of exercising them. At all events, where the original will is produced and proved before him, he needs recourse to no statutory authority to proceed; no statute has restrained his general authority. Nor is he bound by the terms or the equity of that statute to exact security of foreign executors. Since the passage of the law of eighteen hundred and twenty-eight, I have known repeated cases, conducted under the advice of astute counsel, where original foreign wills have been proved in the usual man-

[In the matter of Abraham Coursen's Will.]

ner, both before the ordinary and surrogate, without reference to the statute : and no security has ever, to my knowledge, in any such case, been exacted of foreign executors. Where, however, it is necessary, or the executors choose to proceed under the statute, of course they are bound by its terms, and must give bond as is thereby required.

But suppose, in the case of a foreign will, proved in another state, one executor has applied under the statute, may not another executor produce and prove the original will, irrespective of the statute ? I have no doubt he may. The statute is not compulsory where the original will can be produced. There is no reason why a foreign executor, for example, should be compelled to proceed under the statute, because his co-executor may have done so, and thus be bound to give security contrary to the general policy of the law. He is invested by his testator with a personal trust and confidence. He accepted a burden at the hands of his deceased friend ; and it is against all sound reason that he should be fettered and bound by restrictions which that friend never intended to impose ; or that the latter should be deprived, by an arbitrary rule of law, of the services of one to whom he wished to commit the care of his estate after his death.

Nor is it necessary that the executor who produces the original will, should prove it before the same surrogate who has already granted letters testamentary to his co-executor. He may, without doubt, prove it before the ordinary, or perhaps before another surrogate. The applications are distinct and independent. When, however, the executors have all taken out letters, they are co-executors of the will, and must sue and be sued jointly, in the same manner as if they had all proved the will at the same time, and before the same officer.

With reference, therefore, to those points of objection made to this application, which I have thus far considered, I should have no hesitation in allowing probate of this will and codicil by the applicant.

But there is one difficulty in this case, which cannot be sur-

mounted. Notwithstanding the complete original jurisdiction which the ordinary has in all cases of probate and administration, his jurisdiction is concurrent with that of his surrogates. These officers have long been recognized by the laws, and although they at first derived their powers from the ordinary, as his deputies, those powers have been confirmed to them by long usage and successive declaratory acts of the legislature; and the ordinary cannot now resume them at will, nor supersede their proceedings under and by virtue of those powers. And it follows as a necessary consequence, that whenever a surrogate has obtained cognizance of a particular case, the ordinary cannot interfere *pendente lite*. He may review the surrogate's proceedings by appeal, but in no other way. The concurrent jurisdiction of the surrogates is extended by the act of eighteen hundred and twenty-eight, to cases of the kind now under consideration, even if they did not have it before.

The question then arises, had the surrogate of Morris taken cognizance of this case when application was made to the ordinary? Most assuredly he had. If Marsh had alone applied to the surrogate of Morris for letters testamentary under the statute, the ordinary could still have taken cognizance of Coursen's application. But it appears by the certified copy of the surrogate's proceedings, that both these executors applied to him; and until that application, and the cognizance of the surrogate arising thereupon, were exhausted, I could not interfere. And it appears that Coursen's application to this court was made pending the proceedings in Morris. I cannot, therefore, take cognizance of the case. It would be a pernicious example to be set by the ordinary. I must refuse the probate of this will and codicil on the application now before me. If a subsequent application should be made, free from this objection, after the surrogate's cognizance is spent, I shall have no hesitation in granting it.

In making this decision, of course, I receive the certified copy of the surrogate's proceedings as a verity. I am bound to respect his attestation under his official seal. In this court it

[In the matter of Abraham Coursen's Will.]

has the effect of a record, against which I cannot admit counter averments. The proof which has been offered to impeach it, I cannot receive. Any error or irregularity in the proceedings of the surrogate, can come before me only by appeal.

The decision of this case cannot, in the least, be affected by any aspect of the contest between these executors, on which it is not proper for me now to remark; nor is it affected by the fact that Marsh cannot take out letters in New-York without giving security. I am to decide by the law of New-Jersey, without reference to the laws of New-York. The latter might have to be consulted in determining the validity of the will, but not in determining the mode of granting probate. Nor is the question affected by the amount, the situation, or the nature of the estate. Be it large or small, real or personal, in New-York or in New-Jersey, the law regulating the manner of probate here, must be the same.

As to the question whether Marsh might put in a *caveat* before me, against proving the codicil, I am inclined to think he might. A *caveat* is incident to all ecclesiastical courts, and prevents the case from being proceeded in without the *caveator* being heard. It is a general rule that all persons who might be injured by admitting a will or codicil to probate, may *caveat* against it. In this case, Marsh was appointed an executor by the original will; the codicil substitutes a new co-executor to act with him. There may be strong reasons why this substitution should operate injuriously to him. But as it is not necessary to decide this point, I shall express no positive opinion upon it.

The application is refused.